## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## at PIKEVILLE

COMMONWEALTH OF KENTUCKY,    )
EX REL. GREGORY D. STUMBO,    )
ATTORNEY GENERAL, and    )
PIKE COUNTY,    )
    )
    Plaintiffs,    )
    )    Case No. _____
VS.    )
    )    **Electronically Filed**
PURDUE PHARMA, L.P.,    )
PURDUE PHARMA, INC.,    )
THE PURDUE PHARMA FREDERICK    )
COMPANY, INC., D/B/A    )
THE PURDUE FREDERICK    )
COMPANY, PURDUE    )
PHARMACEUTICALS, L.P.,    )
P.F. LABORATORIES, INC.,    )
ABBOTT LABORATORIES, and    )
ABBOTT LABORATORIES, INC.,    )
    )
    Defendants.    )

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1331, 1441 and 1446,

Defendants Purdue Pharma L.P. (individually, and as successor in interest to The Purdue Pharma

Company), Purdue Pharma Inc., The Purdue Frederick Company, Inc. d/b/a The Purdue

Frederick Company, Purdue Pharmaceuticals, L.P., and The P. F. Laboratories, Inc. ("Purdue"),

hereby remove this case from the Pike County Circuit Court, Commonwealth of Kentucky, to the

United States District Court for the Eastern District of Kentucky.  In support of this Notice of

Removal, Purdue states as follows:

## BACKGROUND

1.      Plaintiffs, the Commonwealth of Kentucky, *ex rel*. Gregory D. Stumbo,
Attorney General, and Pike County, Kentucky, commenced this action in the Pike County Circuit
Court, Commonwealth of Kentucky, on October 4, 2007.  The Plaintiffs filed a First Amended
Complaint on October 10, 2007.  A copy of the Summons, Original Complaint and First
Amended Complaint ("FAC") is attached hereto as Exhibit A.  Service was effected on Purdue
Pharma L.P. on October 11, 2007.

2.      This action involves allegations regarding the FDA-approved medicine
OxyContin®.  Multidistrict litigation, *In re OxyContin Antitrust Litigation,* MDL No. 1603, is
pending before the Honorable Sidney H. Stein in the United States District Court for the
Southern District of New York.  Purdue intends to seek transfer of this action to the United
States District Court for the Southern District of New York given the pendency of several actions
in that court that make, *inter alia,* the same allegations as plaintiffs make here.[1]  As explained in
the Motion, transfer will conserve the Court and the parties' resources, avoid duplicative
litigation and prevent inconsistent rulings on global issues – including jurisdictional issues.
*See, e.g., Franklin, on behalf of the State of Colorado v. Merck & Co., Inc.*, 2007 U.S. Dist.
LEXIS 5010 (D. Colo. Jan. 24, 2007) (transferring removed case to MDL and issuing a stay
where, as here, a pharmaceutical defendant removed the case on the ground that the plaintiff's
state law claims "directly implicated the Federal Food, Drug and Cosmetic Act ("FDCA") [and]
federal Medicaid law involving which drugs a state must cover under its Medicaid program and
the circumstances under which a state can decline to pay for such drugs").

---

[1]      Two actions, which also contain overlapping claims and allegations as those asserted here, are also pending
in the Southern District of New York before the Honorable John G. Koeltl.  Purdue has requested that those
actions also be designated as related to the *In re OxyContin Antitrust Litigation* MDL and that application is
presently pending.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 97(a), because it is the "district and division embracing the place where such action is pending."  *See* 28 U.S.C. § 1441(a).

4.      Defendants Abbott Laboratories and Abbott Laboratories, Inc. ("Abbott") expressly consent in this removal and will be filing a Notice of Consent with the Court.

5.      Purdue will promptly (a) file a true and correct copy of this Notice with the Clerk of Court for the Pike County Circuit Court, Commonwealth of Kentucky, in accordance with 28 U.S.C. § 1446(d), and (b) serve plaintiffs' counsel with a true and correct copy of this Notice of Removal, in accordance with 28 U.S.C. § 1446(d).

## ALLEGATIONS AND REQUESTED RELIEF

6.      Plaintiffs allege that Purdue misrepresented the efficacy and risks of OxyContin, and as a result of these misrepresentations "the Kentucky Medicaid program has spent, and will continue to spend, millions of dollars each year to pay for excessive prescription costs, health care and medical costs and to provide necessary services and programs on behalf of indigents and other eligible citizens who have used or will use OxyContin and have suffered or will suffer deleterious health effects therefrom."  See Ex. A, FAC, at ¶ 87 (Count I:  "Medicaid Fraud").  Plaintiffs also allege that statements in the FDA-approved package insert labeling for OxyContin were false and misleading and that Purdue is liable for "promoting and marketing OxyContin" consistent with that labeling.  Ex. A, FAC, at ¶¶ 62-68; *see also id.* at ¶¶ 92-94 (Count II: "False Advertising"); ¶¶ 119-22 (Count VII: "Negligence"); ¶¶ 130-36 ("Strict Liability"); and ¶¶ 137-55 ("Fraud").

7.      Despite the fact that Congress entrusted the U.S. Department of Health and Human Services with the sole power to determine the circumstances under which a state can

exclude from its Medicaid formulary a covered outpatient drug subject to a rebate agreement, *see* 42 U.S.C. § 1396r-8(d)(4)(B), plaintiffs seek reimbursement for prescription and healthcare costs they allege were incurred due to Purdue's wrongful conduct.  *See* Ex. A, FAC, Prayer for Relief at ¶¶ H & I.

8.     Despite the fact that Congress entrusted the U.S. Food & Drug Administration ("FDA") with sole power to determine what medicines can be marketed in the United States, the sole power to determine the content of warning labels, and sole power to enforce the federal Food, Drug & Cosmetic Act ("FDCA"), 21 U.S.C. § 337(a), plaintiffs seek injunctive relief to (a) restrain Purdue from engaging in allegedly "unfair or deceptive acts and practices in the marketing and promotion of OxyContin" (Prayer for Relief at ¶ K); (b) provide "declaratory and/or injunctive relief as permitted by law as necessary to assure that the Plaintiffs have an effective remedy and to stop Defendants' promotion and marketing of OxyContin for inappropriate uses in Kentucky, currently and in the future" (Prayer for Relief at ¶ L); and (c) require Purdue to create "a Court-supervised fund" for patients who allegedly were and will be harmed by OxyContin (Prayer for Relief at ¶ O).

## FEDERAL QUESTION JURISDICTION

9.     This Court has federal question jurisdiction under 28 U.S.C. § 1331 and under the principles set forth in *Grable & Sons Metal Prods., Inc. v. Dante Eng'g & Mfg,* 545 U.S. 308 (2005).

10.     The United States Supreme Court held in *Grable* that "federal question" jurisdiction did not require the plaintiff to have asserted a violation of a federal statute providing a private parallel federal right of action.  Rather, a case asserting only state law causes of action is removable if it raises a substantial federal question, "actually disputed and substantial, which a

federal forum may entertain without disturbing any congressionally approved balance of federal and state responsibilities."[2]  *See Grable*, 545 U.S. at 314; *see also County of Santa Clara* v. *Astra USA, Inc.*, 410 F. Supp. 2d 1022 (N.D. Cal. 2005).  A federal court has original jurisdiction over an action filed in state court under the substantial federal question doctrine,  "where the vindication of a right under state law necessarily turn[s] on some construction of federal law." *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 9 (1983).  Under the framework set forth in *Grable*, in deciding the jurisdictional question, the Court should consider "the importance of having a federal forum for the issue" given "the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues."  *Grable*, 545 U.S. at 319, 312.

11.     As more fully explained below, plaintiffs' claims directly raise issues in federal Medicaid law, which determines which drugs a state must cover under its Medicaid program and the limited circumstances under which a state can decline to pay for such drugs, *see* 42 U.S.C. §§ 1396r-8(d)(1)(B), (d)(4).

### A.     Alleged Violations of Federal Medicaid Law

12.     Plaintiffs' claims depend upon proof that, absent Purdue's alleged misrepresentations, yet still consistent with federal law, Kentucky could and would have spent less money on OxyContin.  Since plaintiffs' Medicaid program must comply with federal law, plaintiffs have to show that Kentucky could and would have taken steps to limit its reimbursements for OxyContin without violating federal law.  Plaintiffs' ability to take these

---

[2] It is well settled that "[a] plaintiff's characterization of a claim as based solely on state law is not dispositive of whether federal question jurisdiction exists."  *In re Otter Trail Power Co.*, 116 F.3d 1207, 1213 (8th Cir. 1997).  Under the "artful pleading doctrine," plaintiffs may not "defeat removal by omitting to plead necessary federal questions in a complaint."  *People of the State of California ex rel Bill Lockyer, Attorney General of the State of California v. Powerex Corp.*, 2006 U.S. Dist. LEXIS 19634, at *6-7 (E.D. Cal. April 14, 2006) (citing *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 22 (1983)).

steps under the federal Medicaid regulatory scheme is an essential element of its claims and requested relief.

13.    Recently, in *State of West Virginia ex rel. Darrell v. McGraw, Jr., Attorney General v. Eli Lilly & Co., Inc.*, 476 F. Supp. 2d 230 (E.D.N.Y. March 6, 2007), United States District Judge Jack Weinstein held that the State of West Virginia's claims against Eli Lilly for injuries "arising from payments for drugs made as part of its participation in the federal Medicaid program" presented a substantial and disputed federal question and therefore provided the basis for removal under 42 U.S.C. §§ 1331 & 1441(a).  *Id.* at 233.

14.    Similarly, in *State of Louisiana, ex rel. Charles C. Foti, Jr., Attorney General v. Eli Lilly & Co., Inc.*, 375 F. Supp. 2d 170 (E.D.N.Y. 2005), the court held that it had federal question jurisdiction over state law claims involving Eli Lilly's marketing of Zyprexa and the State of Louisiana's payments for Zyprexa under Medicaid.  *Id.* at 172-73.

15.    Similarly, in another recent case involving Medicaid drug pricing, the court in *County of Santa Clara v. Astra USA, Inc.,* 410 F. Supp. 2d 1022 (N.D. Cal. 2005), invoked federal question jurisdiction under *Grable* because plaintiff's state law claims against pharmaceutical manufacturers for allegedly overcharging the County for Medicaid drugs presented substantial questions of federal law.  *Id.* at 1023.

16.    Because plaintiffs' Medicaid claims, like those in *McGraw*, *Foti*, and *County of Santa Clara,* will necessarily involve substantial federal questions, this Court has federal question jurisdiction over plaintiffs' claims under 42 U.S.C. § 1331.

17.    As plaintiffs acknowledge in the FAC, "[t]he Kentucky Medicaid Program is a joint state and federal program which pays for medical care, including prescription drug benefits, for Kentucky's poor citizens."  Ex. A, FAC, at ¶ 77.  The federal Medicaid program

authorizes federal grants to states to provide medical assistance to low income individuals.  42

U.S.C. § 1396, *et seq.*  "Although participation in the program is voluntary, participating States

*must comply* with certain requirements imposed by the Act and regulations promulgated by the

Secretary of Health and Human Services." *Wilder v. Virginia Hosp. Assn.,* 496 U.S. 498, 502

(1990) (emphasis added).

      18.    Federal law requires participating states, including the Commonwealth of

Kentucky, subject to certain exceptions, to reimburse FDA-approved prescription drugs of a

manufacturer that has entered into and complies with a rebate agreement with the Secretary of

Health and Human Services.  42 U.S.C. § 1396r-8(d)(4)(B).  Thus, Kentucky is ***required*** under

federal law to reimburse companies for drugs, such as OxyContin, if the manufacturer complies

with federal requirements.  At all relevant times, Purdue participated in and complied with those

federal requirements.  *See* Ex. B, Long Decl., at ¶ 12.

      19.    The only time a state can refuse to provide coverage for an outpatient drug

subject to a rebate agreement is "with respect to the treatment of a specific disease or condition

for an identified population . . . if, based on the drug's labeling . . . the excluded drug does not

have a significant clinically meaningful therapeutic advantage in terms of safety, effectiveness,

or clinical outcome of such treatment for such population over other drugs included in the

formulary and there is a written explanation (available to the public) of the basis for the

exclusion." 42 U.S.C. § 1396r-8(d)(4)(B).  Moreover, even a state's decision to require prior

authorization must satisfy federally mandated requirements.  42 U.S.C. §§ 1396r-8(d)(5).  Thus,

every step a state takes with regard to Medicaid coverage of an FDA-approved drug is subject to

strict federal mandates.

20.     Not only is the Commonwealth's discretion to deviate from federal Medicaid guidelines strictly curtailed, but the Secretary of Health and Human Services is entrusted with substantial authority to protect federal interests and penalize those states that fail to follow the guidelines.  The Medicaid Act authorizes the Secretary to withdraw approval of plans for non-complying states.  *See* 42 U.S.C. § 1316(a).  The Act also authorizes the Secretary to curtail funds to states whose plans are not in compliance with the Act.  *See* 42 U.S.C. § 1396c.

21.     Plaintiffs allege that, through Medicaid, both Kentucky and the federal government have "spent, and will continue to spend, millions of dollars each year to pay for excessive prescription costs, health care and medical costs and to provide necessary services and programs on behalf of indigents and other eligible citizens who have used or will use OxyContin and have suffered or will suffer deleterious health effects therefrom."  Ex. A, FAC, at ¶ 87.

22.     Plaintiffs demand monetary damages for Purdue's alleged "misrepresentations and/or omissions" which "have caused damages to the Kentucky Medicaid Program."  *See, e.g.*, Ex. A, FAC, at ¶ 88.  Specifically, "[t]he Commonwealth seeks reimbursement for the health care costs, medical care costs, prescription costs, and rehabilitation and other programs and services costs paid."  *Id.* at ¶ 106; *see also* ¶ 112.  These claims raise substantial questions of federal law under the federal Medicaid statute because they depend upon the interpretation and application of the federal statutory provisions that govern what drugs can be included in or rejected from coverage by state Medicaid programs, including Kentucky's, and because federal funds constitute the majority of Kentucky's Medicaid program funds, which funds are at issue in this lawsuit.  Indeed, plaintiffs' claims, and plaintiffs' requested relief, require a determination as to whether Kentucky, consistent with federal law, could have ***refused to pay*** for any OxyContin prescription that a physician had found to be medically appropriate.  It

is not possible for these claims to proceed without a determination on these substantial and disputed federal Medicaid issues.

23.     Plaintiffs' Medicaid claims, like the claims of the West Virginia Attorney General, Louisiana Attorney General, and the County of Santa Clara, California, arise "in an area . . . that impact[s] a complex federal regulatory scheme" and have far-reaching implications for federal regulation of Medicaid reimbursement.  *County of Santa Clara*, 401 F. Supp. 2d at 1027. Like those cases before it, this case is removable pursuant to this Court's federal question jurisdiction under § 1331 and *Grable*.

**B.**     **Federal Preemption of Drug Labeling and Warning**

24.     "When a federal statute wholly displaces the state-law cause of action through complete preemption," the federal court has original jurisdiction over the matter. *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 8 (2003) ("When the federal statute completely pre-empts the state-law cause of action, a claim, which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law.").

25.     Courts find complete preemption where there is a "congressional intent in the enactment of a federal statute not just to provide a federal defense to a state created cause of action but to grant a defendant the ability to remove the adjudication of the cause of action to a federal court by transforming the state cause of action into a federal cause of action."  14B Charles Alan Wright, et al., *Federal Practice and Procedure* § 3722.1 (3d ed. 1998 & Supp. 2005).  There is complete preemption here for two reasons:  (1) certain injunctive relief Plaintiffs' seek can only be implemented by the FDA; and (2) Plaintiffs' false advertising claims are completely preempted by the FDCA and FDA regulations.

26.     According to Plaintiffs' own allegations, "The United States Food and Drug Administration ("FDA") ***is the agency of the United States responsible for protecting the***

*public health by ensuring the safety, efficacy, and security of human drugs and for enforcing*

*the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301, et seq."* FAC ¶ 29

(emphasis added).

27.     Indeed, as a currently-marketed prescription drug, OxyContin is subject to

extensive regulation by the FDA.  The FDCA requires the FDA to ensure that "drugs are safe

and effective" for their intended uses, 21 U.S.C. § 393(b)(2)(B), in part by "promptly and

officially reviewing clinical research and taking appropriate action on the marketing of regulated

products."  21 U.S.C. § 393(b)(1).  The FDA has the authority to promulgate regulations to

enforce the FDCA, which are codified in the Code of Federal Regulations, 21 C.F.R. § 200, *et*

*seq.* 21 U.S.C. § 371(a).

28.     To accomplish its purpose, the FDA maintains a Center for Drug

Evaluation and Research (the "CDER").  The CDER regulates pharmaceutical companies'

development, testing and research, and manufacture of drugs.  The CDER examines data

generated by these companies to conduct a risk/benefit analysis and make an approval decision

regarding a drug's safety and efficacy.  The CDER also ensures truthful labeling and advertising

for prescription drugs, in part by approving package inserts that properly outline benefit and risk

information.  *Id.*  Once drugs are marketed, the CDER continues to monitor them for unexpected

health risks that may require public notification, a change in labeling, or removal of the product

from the market.  In short, the CDER evaluates and monitors the effectiveness and safety of

prescription drugs.  *See* http://www.fda.gov/cder/about/faq/default.htm.

29.     Promotional communications to physicians about OxyContin are

contained within, and restricted by, warning, labeling, and promotional materials, such as the

package insert, that are approved and monitored by the FDA to ensure the provision of accurate

information about the drug's comparative risks and benefits.  Under federal regulations, even claims in promotional labeling or advertising must be consistent with approved labeling.  21 C.F.R. § 202.1(e)(4) (2005); *see also* Ex. A, FAC, at ¶ 31.

30.   Indeed, FDA, acting under federal law, controls every aspect of the package insert, as well as other labeling, for OxyContin:

- Each and every statement in the package insert must be scientifically or medically substantiated.  21 C.F.R. § 314.50(c)(i) (proposed package insert must be submitted "with annotations . . . that support the inclusion of *each statement*") (emphasis added); *see id.* § 201.56(a) (requiring "essential scientific information" in package insert).

- FDA requires that the labeling for a drug follow a set format, 21 C.F.R. § 201.56, including a separate section entitled "Warnings."  *Id.* §201.57(d)(1).

- FDA requires the "Warnings" section of the labeling to include a description of "serious adverse reactions and potential safety hazards, [and] limitations on use imposed by them."  *Id*. §201.57(e).  FDA requires a warning if "there is reasonable evidence of an association of a serious hazard with a drug; a causal relationship need not have been proved."  *Id.*

- FDA requires that the package insert and other labeling be "neither promotional in tone nor false or misleading in any particular."  *Id.* §201.56(b).

- If FDA approves a drug's package insert, then the manufacturer is obligated to use it "exactly" as approved by FDA.  *Id.* §314.105(b) (approval of drug is "conditioned" upon manufacturer incorporating the warnings "exactly as directed" by FDA).

- After approving a drug's package insert, FDA actively monitors the drug to determine whether additional warnings should be required.  *Id.* §314.150(b)(3) (FDA evaluates all "new information" to determine whether labeling is adequate and will withdraw approval if manufacturer fails to correct labeling after notice from FDA of any required changes).

- A drug manufacturer is not permitted to change the package insert without FDA approval.  *Ehlis v. Shire Richwood, Inc.*, 233 F. Supp. 2d 1189, 1198 (D. N. D. 2002) ("[D]efendants were prohibited from changing [the label] without prior approval from the FDA, except in limited circumstances for a limited period of time."), *aff'd on learned intermediary grounds,* 367 F.3d 1013 (8th Cir. 2004). Under 21 C.F.R. § 314.70(c), only minor changes may be made to the package

insert without prior FDA approval, and even then the manufacturer is at risk if FDA subsequently disapproves the change.

31.    The FDA's responsibility to regulate prescription drugs sold in the United States, and to enforce laws with respect to such drugs, inclusive of the precise content and format of prescription drug labeling (e.g., the instructions, warnings, precautions, adverse reaction information provided by manufacturers, and marketing materials), is plenary and exclusive.  *See* 21 U.S.C. § 301 *et seq.*[3]

32.    Against this comprehensive federal regulatory scheme, Plaintiffs request the creation of "a Court-supervised fund" to perform many of the responsibilities that are, by statute, within the exclusive province of the FDA.  For example, plaintiffs request the fund "[n]otify individuals who used OxyContin of the potential harm from OxyContin," Ex. A, FAC, at Prayer for Relief ¶ O(a); "[g]ather and forward to treating physicians information related to the diagnosis and treatment of injuries which may result from using OxyContin," *id.* at ¶ O(f) (in conflict with FDA's exclusive responsibility to determine warnings and requiring Purdue to provide more and different information than authorized by the FDA-approved warnings). Plaintiffs also request the Court to order Purdue to "[c]reate, maintain and operate a 'registry' in which relevant demographic and medical information concerning all OxyContin users is

---

[3] On January 24, 2006, the FDA announced a new rule which includes a detailed and emphatic statement of the FDA's intention that its approval of product labeling, whether in the "old" format or the format required by the new rule, completely preempt state law claims related to the adequacy of prescription drug warnings because such claims frustrate "the full objectives of the Federal law."  *See* Requirements on Content and Format of Labeling for Human Prescription Drug and Biologic Products, 71 Fed. Reg. 3922, 3935, 3934 (Jan. 24, 2006) ("FDA believes that under existing preemption principles, FDA approval of labeling under the act . . . preempts conflicting or contrary State law."); *see also* Draft Guidelines for Industry on Improving Information About Medical Products and Health Conditions; Withdrawal; Availability, 69 Fed. Reg. 6308-01 (Feb. 10, 2004) ("FDA has responsibility under the Federal Food, Drug, and Cosmetic Act (the act) for regulating advertising for prescription drugs.").  A

gathered, maintained, and analyzed," *id.* at ¶ O(e) (in conflict with FDA's exclusive responsibility to regulate adverse event reporting).  This requested relief is completely preempted by federal law because it can only be granted by the FDA.[4]

33.    Plaintiffs' false advertising claims are also completely preempted by the FDCA and FDA regulations.  According to a recent Third Circuit opinion, "[t]he high level of specificity in federal law and regulations with respect to prescription drug advertising is irreconcilable with general state laws that purport to govern all types of advertising. *See, e.g., 21 U.S.C. § 352(n)*; *21 C.F.R. § 314.81(b)(3)*. Accordingly, the plaintiffs' state consumer fraud claims are preempted."  *Pa. Emples. Benefit Trust Fund v. Zeneca,* 2007 U.S. App. LEXIS 19601, at *36 (3d Cir. Aug. 17, 2007); *see also id.* at *41, n. 13 (Cowen, dissenting) ("the assertion that the mere 'volume and complexity' of agency regulations demonstrates an implicit intent to displace all state law in a particular area is a field preemption argument").  Allowing state consumer fraud claims "to proceed would unnecessarily frustrate the FDCA's purpose and FDA regulations, as the extent of agency involvement in regulating prescription drug advertising is extensive and specific."  *Id.* at *33 (*citing* 21 C.F.R. § 202.1(e)(6)(i)-(xx) and (e)(7)(i)-(xiii)).  In short, the FDCA and FDA regulations completely occupy the field when it comes to the regulation of prescription drug advertising.

---

federal agency's interpretation of regulations is "controlling unless plainly erroneous or inconsistent with the regulation."  *Auer v. Robbins*, 519 U.S. 452, 461 (1996).

[4] The appropriate procedural mechanism for obtaining the injunctive relief sought by Plaintiffs is a "citizen petition" under 21 C.F.R. § 10.30.  FDA is required by this regulation to respond to a citizen petition within 180 days after the petition is submitted.  *Id.*  Any citizen who is aggrieved by FDA's disposition of a citizen petition is entitled to seek judicial review in federal court of FDA's action.  *See, e.g., Stauber v. Shalala*, 895 F. Supp. 1178 (W.D. Wis. 1995).

## THE FEDERAL INTEREST IN PROVIDING A FORUM

34.     The federal government has a strong interest in having a federal court construe and interpret federal Medicaid law, including questions related to reimbursement for OxyContin under Commonwealth of Kentucky's Medicaid program.

35.     The federal government also has a strong interest in having a federal court determine whether any conduct of Purdue, including the alleged marketing of OxyContin consistent with the package insert, violated any federal laws or regulations related to the labeling and marketing of OxyContin.

36.     The federal government also has a strong interest in having a federal court determine whether a state may impose liability on Purdue for not updating the label to provide more information on abuse liability, as the plaintiffs contend Purdue should have done.  Not only did the FDA approve the label for OxyContin before it was first marketed, and on later occasions when changes were made to the label, but the FDA also was closely involved with the precise labeling issue raised by the plaintiffs in this case.

37.     In the FAC, Plaintiffs' also rely heavily on certain settlements between Purdue and the Federal Government.  *See* Ex. A., FAC, at ¶ 72.  The federal courts have continuing jurisdiction over the administration and interpretation of the settlements and the court orders implementing and approving these settlements.  *See United States v. Purdue Frederick Inc., et al.*, Docket no. 1:07CR00029.  The federal government has a strong interest in the uniform interpretation and enforcement of the settlement agreements and related orders.

38.     Plaintiffs' claims may be vindicated or defeated only by construction of federal statutes, regulations, and orders.  The availability of a federal forum to protect the important federal interests at issue is therefore consistent with *Grable,* and determination by a

federal court of the substantial and disputed federal issues that lie at the heart of this case would not "disturb[ ] any congressionally approved balance of federal and state judicial responsibilities." *Grable,* 545 U.S. at 314.

## DIVERSITY JURISDICTION UNDER THE CLASS ACTION FAIRNESS ACT

39.    This Court additionally has original jurisdiction over this action, and the action may be removed to this Court, pursuant to the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) ("CAFA").

40.    As set forth below, this is functionally a putative class action or representative action in which:  (1) there are 100 or more members in the alleged class; (2) the citizenship of any member of the proposed class is minimally diverse from the citizenship of any defendant; and (3) based on plaintiffs' allegations, the amount in controversy exceeds the sum or value of $5,000,000 in the aggregate, exclusive of interest and costs (the jurisdictional minimum under the CAFA).  Thus, this Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

### A.    This Action Includes Class Action Claims Involving A Proposed Class Consisting of More Than 100 Members

41.    The CAFA applies to any "class action," which is defined as "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B).  In enacting the CAFA, Congress has clearly stated that the "overall intent" of Section 1332(d) is:

> to strongly favor the exercise of federal diversity jurisdiction over class actions with interstate ramifications.  In that regard, the Committee further notes that ***the definition of "class action" is to be interpreted liberally***.  Its application ***should not be confined solely to lawsuits that are labeled "class actions" by the named plaintiff*** or the state rulemaking authority.  Generally speaking, ***lawsuits that***

> *resemble a purported class action should be considered class actions for the*
> *purpose of applying these provisions*.

S. Rep. No. 109-14, at 35 (2005), *reprinted in* 2005 U.S.C.C.A.N. 3 (emphasis added); *see also*

*id.* at 36 ("the core concept of the bill is that class actions filed against defendants outside their

home state are subject to federal jurisdiction"); *id.* at 43 ("Overall, new section 1332(d) is

intended to expand substantially federal court jurisdiction over class actions.  Its provisions

should be read broadly, with a strong preference that interstate class actions should be heard in a

federal court if properly removed by any defendant.").

       42.     In the FAC, the Attorney General of the Commonwealth of Kentucky

purports to bring this action "on behalf of the Commonwealth of Kentucky ***and its citizens***"

pursuant to his *parens patriae* authority.  Ex. A, FAC, at ¶¶ 6, 21 (emphasis added); *see also id.*

at ¶¶ 5, 144-45, 151-52.  The Attorney General claims to have the authority to bring these claims,

including private claims on behalf of Kentucky citizens, under "Section 91 of the Kentucky

Constitution, KRS § 15.020, KRS § 15.060, KRS § 446.070 and Kentucky common law."  *Id.* at

¶ 6.  Indeed, plaintiffs expressly seek to recover "restitution and reimbursement for all the costs

***consumers***" – not the Commonwealth or Pike County – "have incurred in excessive and

unnecessary prescription costs related to OxyContin."  *Id.* at ¶ 5 (emphasis added); *see id.* Prayer

for Relief at ¶ J (seeking "restitution and reimbursement for all prescription costs incurred by

consumers related to OxyContin").  Thus, the Commonwealth purports to represent and bring

private claims on behalf of a class of all private citizens of Kentucky who may have claims

against the defendants relating to those private citizens' purchase and/or use of OxyContin.

These claims constitute a "class action" subject to the CAFA.

       43.     The class of Kentucky citizens that the Attorney General purports to

represent equals or exceeds 100.  *See* 28 U.S.C. § 1332(d)(5)(B).  *See* Ex. B, Long Decl., at ¶ 10;

*see also* S. Rep. No. 109-14, at 42 ("the subsection 1332(d)(5)(B) exception for 'limited scope' cases (actions in which there are fewer than 100 class members) should also be interpreted narrowly.  For example, in cases in which it is unclear whether 'the number of members of all proposed plaintiff classes in the aggregate is less than 100,' a federal court should err in favor of exercising jurisdiction over the matter.").

     **B.**    **This Action Satisfies Minimal Diversity Under the CAFA**

     44.    The CAFA requires only minimal diversity and affords this Court original jurisdiction where "any member of a class of plaintiffs is a citizen of a State different from any defendant."  28 U.S.C. § 1332(d)(2)(A).  That requirement in met in this case.

     45.    At the time plaintiffs commenced this action, Purdue Pharma L.P. was a Delaware limited partnership with a principal place of business in Connecticut, with a general partner (Purdue Pharma Inc.) that was a New York corporation with a principal place of business in Connecticut, and with no limited partner that was a citizen of Kentucky; Purdue Pharma Inc. was a New York corporation with a principal place of business in Connecticut; The Purdue Frederick Company, Inc. d/b/a The Purdue Frederick Company was a New York corporation with a principal place of business in Connecticut; Purdue Pharmaceuticals, L.P. was a Delaware limited partnership with a principal place of business in North Carolina, with a general partner (Purdue Pharma Inc.) that was a New York corporation with a principal place of business in Connecticut, and with no limited partner that was a citizen of Kentucky; and The P.F. Laboratories, Inc. was a New Jersey corporation with a principal place of business in New Jersey.  *See* Ex. B, Long Decl., at ¶¶ 4-8; *see also* Ex. A, FAC, at ¶¶ 10-14.  Therefore, for purposes of diversity jurisdiction, at the time plaintiffs commenced this action, the Purdue

defendants were variously citizens of states other than Kentucky, and no Purdue defendant was a citizen of Kentucky.

46.     At the time plaintiffs commenced this action, Abbott Laboratories was an Illinois corporation with a principal place of business in Illinois, and Abbott Laboratories, Inc. was a Delaware corporation with a principal place of business in Illinois.  *See* Ex. A, FAC, at ¶¶ 15-16.  Therefore, for purposes of diversity jurisdiction, at the time plaintiffs commenced this action, the Abbott defendants were variously citizens of Illinois and Delaware.

47.     The members of the class of Kentucky citizens that the Attorney General purports to represent are all citizens of Kentucky.  *See* Ex. A, FAC, at ¶ 6.

48.     Accordingly, "any member of [the] class of plaintiffs is a citizen of a State different from any defendant," and minimal diversity is satisfied.  28 U.S.C. § 1332(d)(2)(A).

**C.     This Action Satisfies the Amount in Controversy Requirement**

49.     Under the CAFA, this Court has "original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs."  28 U.S.C. § 1332(d)(2).  Based on the relief plaintiffs seek, the amount in controversy requirement is satisfied.

50.     In the FAC, plaintiffs expressly admit that "the damages are in excess of . . . the diversity jurisdiction limits of the United States District Court."  Ex. A, FAC, at ¶ 17.

51.     According to the allegations in the FAC, the amount in controversy in this "civil action" exceeds $5,000,000, exclusive of interest and costs.  *See* 28 U.S.C. § 1332(d)(2); *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 448-49 (7th Cir. 2005) (under the CAFA, analysis of amount in controversy "concerns what the plaintiff is claiming . . . not whether plaintiff is likely to win or be awarded everything he seeks").

a.) Plaintiffs allege in the FAC that the Commonwealth and Pike County spend "millions of dollars each year" in connection with the harms they claim OxyContin causes.  Ex. A, FAC, at ¶¶ 3-4.  For example, plaintiffs allege, "From 1998 – 1st quarter of 2006, the Kentucky Medicaid program expended over $22 million (CMS figure) for OxyContin (State figures from 2000-2007 show $18 million)."  *Id.* at ¶ 79; *see also id.* at ¶ 87 ("the Kentucky Medicaid program has spent, and will continue to spend, millions of dollars each year" on OxyContin-related services).

b.) Plaintiffs seek relief in the form of "restitution and reimbursement sufficient to cover all prescription costs the Commonwealth has incurred related to OxyContin due to Defendants' wrongful conduct, with said amount to be determined at trial" *Id.* Prayer for Relief at ¶ H.

c.) Plaintiffs also seek relief in the form of "restitution and reimbursement sufficient to cover all costs expended for health care services and programs associated with the diagnosis and treatment of adverse health consequences of OxyContin use, including but not limited to addiction due to Defendants' wrongful conduct, with said amount to be determined at trial." *Id.* Prayer for Relief at ¶ I.

d.) Plaintiffs also seek relief in the form of "restitution and reimbursement for all prescription costs incurred by consumers related to OxyContin." *Id.* Prayer for Relief at ¶ J.

e.) Plaintiffs also seek relief in the form of a permanent injunction prohibiting the defendants from "engaging in unfair or deceptive acts and practices in the marketing and promotion of OxyContin," regardless of whether the marketing or promotional statements have been approved or directed by the FDA.  *Id.* Prayer for Relief at ¶ K.

f.) Plaintiffs also seek relief in the form of "other and further extraordinary equitable, declaratory and/or injunctive relief as permitted by law as necessary to assure that the Plaintiffs have an effective remedy and to stop Defendants' promotion and marketing of OxyContin for inappropriate uses in Kentucky, currently and in the future," regardless of whether the marketing or promotional statements have been approved or directed by the FDA.  *Id.* Prayer for Relief at ¶ L.

g.) Plaintiffs also seek relief in the form of "pre- and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs of this action."  *Id.* Prayer for Relief at ¶ M.

h.) Plaintiffs also seek relief in the form of "disgorgement" of monies received from the sale of OxyContin.  *Id.* Prayer for Relief at ¶ N.

i.) Plaintiffs also seek relief in the form of "a fund establishing a medical monitoring program" that will also "[n]otify individuals who use or used OxyContin of the potential harm from OxyContin"; "[a]id in the early diagnosis and treatment of resulting injuries through ongoing testing and monitoring of OxyContin use"; "[f]und studies and

research of the short and long term effects of OxyContin and the possible cures and treatments for the detrimental effects of using OxyContin"; "[a]ccumulate and analyze relevant medical and demographic information from OxyContin users, including but not limited to the results of testing performed on them"; "[c]reate, maintain and operate a 'registry' in which relevant demographic and medical information concerning all OxyContin users is gathered, maintained and analyzed"; and "[g]ather and forward to treating physicians information related to the diagnosis and treatment of injuries which may result from using OxyContin." *Id.* Prayer for Relief at ¶ O.

j.) Plaintiffs also seek relief in the form of punitive damages. *Id.* Prayer for Relief at ¶ P.

k.) Plaintiffs also seek relief in the form of "[c]ivil penalties pursuant to KRS § 367.990(8) not more than the greater of five thousand dollars ($5,000.00) or two hundred dollars ($200) per day for each and every violation of KRS § 367.175." *Id.* Prayer for Relief at ¶ R.

l.) Plaintiffs also seek relief in the form of "[a]ny other relief pursuant to KRS § 367.175 including actual damages in an amount to be determined at trial." *Id.* Prayer for Relief at ¶ S.

52.    Moreover, the amount in controversy with respect to the private OxyContin-related claims of the class of Kentucky citizens that the Attorney General purports to represent is itself in excess of $5,000,000, exclusive of interest and costs. *See* Ex. B, Long Decl.,

at ¶ 11; 28 U.S.C. § 1332(d)(6) ("In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.").

## PROPRIETY OF REMOVAL

53.     For the foregoing additional reasons, this Court has jurisdiction over this matter.

54.     This Notice is being filed within 30 days after Purdue's first receipt of a copy of the initial pleading setting forth the claim for relief upon which the action is based, as required by 28 U.S.C. § 1446(b).

55.     Pursuant to 28 U.S.C. § 1446(a), a copy of all process, pleadings, and orders served upon Purdue is attached as Exhibit A.  Additionally, pursuant to Local Joint Order 6.01, copies of all documents previously filed in the Pike County Circuit Court are filed as attached Exhibit C.

56.     The United States District Court for the Eastern District of Kentucky is the federal judicial district embracing the Pike County Circuit Court, Commonwealth of Kentucky, where this suit was originally filed.  Removal to this District is therefore proper under 28 U.S.C. § 1441(a).

57.     Under 28 U.S.C. § 1441 and principles of supplemental jurisdiction under 28 U.S.C. § 1367, where, as here, any portion of the action arises under federal law, the defendants have the right to remove the entire action to this Court.

58.     Accordingly, the present lawsuit may be removed from the Pike County Circuit Court and brought before the United States District Court for the Eastern District of Kentucky pursuant to 28 U.S.C. §§ 1331, 1332(a) and 1441(a).

59.     Pursuant to 28 U.S.C. § 1446(d), Purdue will promptly file a copy of this Notice of Removal with the Clerk of Court for Pike County Circuit Court, and will serve a copy of the same upon counsel for the plaintiffs.  A true and correct copy of the Notice of Filing Notice of Removal to the Pike County Circuit Court is attached hereto as Exhibit D.

60.     Purdue hereby reserves any and all rights to assert any and all defenses and/or objections to the Complaint and FAC.  Purdue further reserves the right to amend or supplement this Notice of Removal.

Dated:     October 29, 2007

s/John M. Famularo
————————————————
John M. Famularo
Daniel E. Danford
STITES & HARBISON, PLLC
250 West Main Street
Suite 2300
Lexington, KY  40507-1758
Telephone: (859) 226-2300
jfamularo@stites.com

COUNSEL FOR PURDUE DEFENDANTS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this the 29th day of October, 2007, I electronically filed the foregoing Notice of Removal with the clerk of the court by using the CM/ECF.  I further certify that on this same date I mailed the foregoing document and the notice of electronic filing by first class mail to the following:

> Susan J. Pope, Esq.
> Frost Brown Todd LLC
> 250 West Main Street, Suite 2700
> Lexington, KY  40507-1749
>
> Gregory D. Stumbo, Attorney General of Kentucky
> Pierce B. Whites, Deputy Attorney General
> Janet M. Graham, Assistant Deputy Attorney General
> Jennifer Black Hans, Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL
> 1024 Capital Center Drive, Suite 200
> Frankfort, KY  40601
>
> Pamela J. Murphy, Assistant Attorney General
>    Director, Medicaid Fraud and Abuse Control Unit
> C. David Johnstone, Assistant Attorney General
> Paula J. Holbrook, Assistant Attorney General
> OFFICE OF THE ATTORNEY GENERAL
> 1024 Capital Center Drive, Suite 200
> Frankfort, KY  40601
> *Counsel for Plaintiff, Commonwealth of Kentucky*
>
> Gary C. Johnson
> Rhonda J. Blackburn
> Bradley A. Sears
> GARY C. JOHNSON, P.S.C.
> 110 Caroline Avenue
> P.O. Box 231
> Pikeville, KY  41502
> *Counsel for Plaintiff, Pike County*

/s/ <i>John M. Famularo</i>
John M. Famularo